**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-396 (TSC)** |
| **v.** | : | |
| | : | |
| **DENNIS GEORGE ADAMS, JR.,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Dennis George Adams to 60 days of incarceration, followed by one year of supervised release. The government also requests that this Court impose 60 hours of community service, and consistent with the plea agreement in this case, $500 in restitution.

## I.      Introduction

Defendant Dennis George Adams Jr., a 49-year-old general contractor from Enumclaw, Washington State, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Adams pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. The government's recommendation is supported by Adams' decisions to: (1) enter the U.S. Capitol Building through a Fire Door after witnessing that door being violently breached by rioters; (2) enter the Capitol Building a second time through a broken window by the Senate Wing Door; and (3) remain on restricted Capitol grounds, even after witnessing violence and observing police struggle to remove rioters and secure the area.

 The Court must also consider that Adams' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Adams' crime support a sentence of 60 days of incarceration.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 16 (Statement of Offense) ¶¶ 1–7.

### Adams' Role in the January 6, 2021 Attack on the Capitol

In late 2020, Adams was active on Twitter, where he posted his concerns about the outcome of the recent Presidential election. On December 25, 2020, to @realDonaldTrump, Adams posted "Ready to fight for u Trump 2020." To @Mike_Pence on December 30, Adams tweeted "Hope you are still in this fight. The Lord wins." And to @dbongino, a political commentator, Adams tweeted "Way past time for the fight."

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Adams made plans to attend the "Stop the Steal" rally that was to be held on January 6, 2021, and left his home on January 4 with his friend, M.W. The two drove together across the country without stopping, taking turns sleeping while the other drove.

On January 6, 2021, Adams and M.W. drove into Washington, D.C. to watch the former President's speech. Adams wore khaki pants, a red Trump sweatshirt and hat, a gaiter around his neck, and a Trump flag as a cape. At the rally, Adams and M.W. were far away from the former President and had trouble hearing the speech. When the former President encouraged attendees to go to the Capitol, Adams and M.W., already in the outer perimeter of the crowd, hurried in the direction of the Capitol, hoping to be among the first to arrive there. Following others who had pulled aside snow fencing, they stepped over fencing and approached the scaffolding by the Inaugural Stage. M.W. and Adams saw people in the crowd fight with police. M.W. climbed the left side of the scaffolding and was separated from Adams. They did not meet up again until later that evening.

Adams also climbed up the scaffolding, where he could see police shooting rubber bullets and chemical irritants into the air in efforts to turn back the rioters. After rioters overwhelmed police on the Northwest Staircase, Adams climbed down the scaffolding and walked across the Upper West Terrace where he leaned against a window ledge. From this vantage point, Adams could see rioters forcefully breach a side Fire Door by the Parliamentarian's office. Adams chose to enter through that same door at approximately 2:57 p.m.



*Image 1: A video posted on Parler showed Adams standing near a window ledge at 2:40 p.m. From this vantage point, Adams watched a side door be violently breached.*



*Image 2: Adams standing near a window ledge by the Fire Door.*



*Images 3: CCTV footage showed Adams walking through the Fire Door at 2:57 p.m.*

The corridor through which Adams entered was packed with rioters, and police began pushing rioters back out through the Fire Door. Adams was pushed out that same door roughly three minutes after entering, at approximately 3:00 p.m.

Adams remained close to the area where he exited, and entered the U.S. Capitol a second time at approximately 3:08 p.m., this time through a broken window next to the Senate Wing Door. After entering, Adams moved with the crowd towards the Crypt, which he entered at around 3:18 p.m.



*Image 4: Adams re-entered the Capitol through a broken window. (CCTV)*



*Image 5: After entering a second time, Adams walked to the Crypt. (CCTV)*

Adams walked back from the Crypt and exited the U.S. Capitol at 3:26 p.m. through the Senate Wing Door.

After exiting the U.S. Capitol a second time, Adams remained on restricted grounds, despite the many clear and obvious signs that he should leave. At approximately 3:45 p.m., Adams was in close vicinity to the North Door, where rioters tried to break down the door and create a new breach. Adams could see rioters aggressively confront police officers who had retreated behind the doors. After police used chemical irritants to clear the area, Adams was filmed in an opensource video *[Sent. Exh. 1]* rubbing his eyes.



*Image 6: The North Door was the location of intense altercations with police, as rioters attempted to force the door open. Adams watched this unfold.[2]*

---

[2] *Available at* Timecode 1:15,
https://ia904504.us.archive.org/0/items/HzjLjjkPpagf5RqQd/1295018211_US_Capitol_Sie.mpeg4



*Image 7 [Sent. Exh. 1 at 00:00 - 01:05]: Adams was visibly impacted by chemical irritants released by police in their continued efforts to clear the area by the North Door.*

Over an hour after having exited the Capitol building, and despite the chaos and violence between rioters and police, Adams continued to occupy the area close to the North Door. At approximately 4:35 p.m., police officers who had grouped together on the West Front moved en masse to the North Terrace in a concerted effort to push rioters further away from the Capitol building. During this process, police fired a flash bang, and Adams was captured in an officer's body worn camera falling to the ground and then getting up again.



*Image 8: Adams fell to the ground as police tried to clear the North Terrace.*

Adams still made no effort to leave, and instead watched rioters push against police and yell profanities at them.



*Image 9: MPD Officer A.C.'s BWC showed that Adams made no effort to leave Capitol grounds as police strugged to clear the area.  See also Sent. Exh. 1 at 41:48-41:53.*

Despite the unmistakably clear efforts by police to get rioters to leave the Capitol's restricted grounds, Adams stood and watched the police line for at least another ten minutes until he finally left Capitol grounds.





*Image 10 shows the police line that pushed rioters away from the Capitol building. Image 11 shows Adams looking directly at this police line while remaining on Capitol grounds.*
*[Sent. Exh. 1 at 47:09-47:20]*

On January 6, Adams was inside the U.S. Capitol for roughly 20 minutes. By the government's rough estimation, drawn from Adams' admissions that he quickly headed to the Capitol with the encouragement of the former President and observed snow fencing be torn down, as well as public source videos showing Adams remaining on Capitol grounds as police cleared the area until just before 5:00 p.m., Adams was on the restricted grounds for well over three hours. During much of this time, Adams witnessed up close the violent confrontations between rioters and police.

*Adams' Pre-Arrest Interviews with the FBI*

Adams was interviewed twice by the FBI prior to his arrest. In the first interview on October 13, 2022, Adams told agents that he traveled to Washington, D.C. with his friend, M.W., to support former President Trump. Adams was newly divorced from a former partner who had previously discouraged his participation in rallies, and Adams was keen on attending the "Stop the Steal" rally. On January 6, 2021, it was difficult for Adams and M.W. to hear the former president's speech from near the Ellipse, so they left the event early and walked in the direction of the U.S.

Capitol building. Adams stated that as he and M.W. approached Capitol grounds, they saw snow fencing. They observed a rioter push over the fencing, and then decided to follow along. Adams admitted to knowing that he had broken the law at that point and was trespassing, but stated that he felt unable to turn back due to the large numbers of people heading towards the Capitol.

Adams and M.W. observed rioters jump over a fence and saw police retreat. As one rioter shouted "let's go!", Adams responded, "Leaders lead from the front!" Adams also told agents that he observed a column of rioters wearing matching brown outfits move to face off with a police line and discharge bear spray. Adams described being further swept up with the crowd as he ventured deeper onto Capitol grounds, where he climbed up scaffolding by the Inaugural Stage. During the chaos, Adams and M.W. were separated. Adams remained up in the scaffolding for around 15 minutes, where he could see police shooting rubbers bullets into the crowd and was hit with objects fired by police and impacted by chemical irritants in the air.

After climbing down from the scaffolding, Adams – denying personal agency – told agents that he had no avenue of escape but to follow the crowd towards the Upper West Terrace. While on the Upper West Terrace, Adams stood near a windowsill and watched events unfold. Adams initially claimed that he first entered the U.S. Capitol Building to retrieve an item stolen by another rioter, and falsely claimed that a police officer gave him permission to enter the Capitol so long as he did not cause trouble or break anything. He also claimed to have not seen any broken windows or doors. Adams stated that after he left the Capitol Building, he remained on Capitol grounds in an effort to locate M.W., and also reported staying close to the police line because he felt safest there. Adams expressed regret for his actions on January 6, stating that he wished he had never moved past the mesh fencing.

Adams was re-interviewed on January 18, 2023. In the second interview, when confronted with images of his movements on January 6, Adams admitted that there were no police at a door who gave him permission to enter. Adams further admitted to entering a second time through a broken window, which he failed to mention during his first interview.

*The Charges and Plea Agreement*

On November 11, 2023, the United States charged Adams by a four-count Information with violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds; 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building or Grounds; and 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. On November 21, 2023, pursuant to a plea agreement, Adams pleaded guilty to Count One of the Information. By plea agreement, Adams agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Adams now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Adams faces up to one year of imprisonment and a fine of up to $100,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) I | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 34-41.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement.

While the government concedes that Section 4C1.1 applies to Adams, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm.

Adams witnessed violence for several hours on January 6, and even though he did not directly assault police, he followed closely behind and benefited from the actions of other rioters who did commit assaults. Adams witnessed rioters assault police from the scaffolding, and then

followed behind them to the Upper West Terrace. He saw rioters violently breach the Fire Door, and then followed them through it. He later climbed through a broken window, taking advantage of the destruction of property caused by other rioters.

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications for criminal activity have gone mainstream.").

The U.S. Probation Office calculated Adams' criminal history as a Category I. PSR at ¶ 54. Accordingly, the U.S. Probation Office calculated Adams' total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 88. Adams' plea agreement contains an agreed-upon Guidelines' calculation that largely follows the U.S. Probation Office's calculation, although the plea agreement does not address a two-level decrease under U.S.S.G. § 4C1.1.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days of incarceration followed by one year of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Adams' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Adams, the absence of violent or destructive acts is not a mitigating factor. Had Adams engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Adams' case was his decision to enter the U.S. Capitol building twice, and then remain on restricted grounds when it was patently obvious that he was participating in a violent riot and should leave. From his vantage point on the scaffolding in front of the Capitol, Adams could see police struggle and be overwhelmed by the rioters. At the Fire

Door entrance, Adams saw the door be violently breached, but he nonetheless decided to enter. Even after exiting the Capitol, Adams remained on restricted grounds for roughly an hour and a half—watching officers struggle to secure North Door, and viewing altercations with police as they tried to clear the North Terrace. Adams had many warnings that he should not be at the U.S. Capitol on January 6; he ignored all of them.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

**B. Adams' History and Characteristics**

Adams has numerous older criminal convictions from when he was 18-19 years old, including the following:

- 10/13/1995: Malicious Mischief; Harassment  ($100 fine)
- 10/24/1995: Unlawful Issuance of a Bank Check ($100 fine)
- 10/4/1995: Driving with a Suspended License (90 days of custody, 89 days suspended; $100 fine)
- 10/4/1995: Theft, Third Degree (365 day custody, 364 days suspended; $150 fine)

In his mid-twenties (and later when he was 33 years old), Adams was convicted numerous times of driving with a suspended license, including the following:

- 10/25/2000: Driving with Suspended License (90 days custody, suspended; 1 year conditional release; $400 fine)
- 11/15/2000: Driving with Suspended License (90 days custody, suspended; $500 fine)
- 05/14/2002: Driving with Suspended License (365 days custody, 357 days suspended, $200 fine)
- 05/24/2004: Driving with Suspended License (90 days custody, suspended; $250 fine)
- 04/14/2010: Driving with Suspended License (90 days custody, suspended; $350 fine)

Despite his history of arrests and convictions, the parties agree that Adams has criminal history category I. While Adams' arrests and convictions are all older, the sheer number of arrests are troubling and indicative of some likelihood of recidivism.

15

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Adams submitted to an interviews with the FBI agents who investigated this case and then pleaded guilty. In his first interview with the FBI, Adams minimized his conduct in some ways, including a statement that police told him he could enter the Capitol building. When confronted with images and video during the second interview, Adams was more forthcoming. Adams helpfully provided agents with the contact information of friends who could corroborate his participation in the riot.

While the government credits Adams for his decision to plead guilty, the government is troubled by repeated statements by Adams in which he minimized his personal agency in the decision to participate in a violent riot. In his interviews with the FBI, and to his friends who were also interviewed at Adams' suggestion, Adams claimed that he was swept up by the crowd and had no place to go but to enter the Upper West Terrace and later the Capitol building. Adams was not swept up, and he clearly could have turned back at any time; he chose to not do that. The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Court must sentence Adams based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Adams has pleaded guilty to Count One, 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

In *United States v. Mazzocco*, 21-cr-54 (TSC), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G) and was sentenced by this Court to 45 days' incarceration and 60 hours of community service. Similar to Adams, Mazzocco treated the events around him on January 6 as an entertaining spectacle, and both defendants were aware of the escalating violence and disorder around them. Both defendants entered the U.S. Capitol through the Senate Wing Door; neither engaged in direct violence against police, though Adams was inside the Capitol for slightly longer than Mazzocco and remained for a longer time on restricted Capitol grounds. Mazzocco lied to FBI agents about not knowing where his video camera was located; Adams initially misrepresented some details of his involvement in the riot. After January 6, Mazzocco attempted to cast blame away from himself and created fictitious stories that "Antifa" was somehow responsible, while Adams admitted that he and other rioters had committed crimes. Mazzocco had no criminal history, whereas Adams has a history of older arrests and convictions.

In *United States v. Robert Bauer*, 21-cr-49 (TSC), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). Both Adams and Bauer were inside the U.S. Capitol for the same amount of time (roughly 17-20 minutes), entered through the Senate Wing Door and traveled to the same location, the Crypt. Both defendants observed police be attacked by other rioters. After leaving the Capitol building Bauer climbed atop of a U.S. government vehicle and posed for photos; Adams, by contrast, remained on Capitol grounds for another hour and half as police struggled to clear the area. Both defendants have older criminal histories, though Bauer's criminal convictions were significantly more serious than Adams'. This Court sentenced Bauer to 45 days' incarceration.

In *United States v. Elias Irizarry,* 21-cr-282-3 (TSC), the defendant pleaded guilty to 18 U.S.C. § 1752(a)(1). Both Irizarry and Adams climbed up scaffolding by the Inaugural Stage and observed rioters attack police on the West Front. Both Irizarry and Adams entered the Capitol through a broken window by the Senate Wing Door. Whereas Irizarry entered a private conference room where he took pictures of himself, Adams did not enter a sensitive office space, but he did enter the Capitol building twice. Both remained on restricted Capitol grounds until nearly dusk after being ejected from the Capitol building. And whereas Irizarry did not express remorse after January 6 and expressed outrage at individuals who turned him in to law enforcement, Adams promptly accepted responsibility and has expressed remorse. Irizarry had no criminal history, whereas Adams has a history of older criminal convictions. This Court sentenced Irizarry to 14 days of incarceration.

### F. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property . . . including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Adams must pay $500 in restitution, which reflects in part the role Adams played in the riot on January 6.[5] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Adams' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See id.*

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Adams to 60 days' incarceration followed by one year of supervision, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Adams' liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Melanie Krebs-Pilotti*
        Melanie Krebs-Pilotti
        Trial Attorney- Antitrust Division
        Cal Bar. No. 241484
        601 D St., NW
        Washington, D.C. 20001
        melanie.krebs-pilotti2@usdoj.gov
        (202) 870-7457